### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

ALBERT CURTIS MILLS,
    Plaintiff,

    v.

MAJOR W. ISER, et al.,
    Defendants.

Civil Action No.:  ELH-22-1691

### MEMORANDUM OPINION

The self-represented plaintiff, Albert Curtis Mills, a prisoner at the North Branch Correctional Institution ("NBCI"), filed a "Verified Complaint" (ECF 1), as supplemented (ECF 1-2), pursuant to 42 U.S.C. § 1983.  ECF 1-2 at 10.  He alleges violations of his constitutional and statutory rights, claiming his religious rights were violated by medical and correctional staff when he engaged in a Christian fast. ECF 1-2 at 17-23. He also alleges that his rights were violated when he was subjected to disciplinary segregation and placed in a holding cell for participating in a religious fast. *Id*. at 18-18, 23-34.[1]  In addition, Mills claims that he was discriminated against on the basis of his mental disability.

Plaintiff seeks relief under the First and Eighth Amendments to the Constitution; the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.*, and perhaps the Americans with Disabilities Act

---

[1] Mills's claims regarding his disciplinary segregation, including that he was denied due process when his disciplinary hearing was held in absentia, and the conditions of his confinement on disciplinary segregation, are presently pending before Judge Chuang in *Mills v. Farris, et al.*, TDC-22-1640 (D. Md.).  Therefore, to the extent that Mills includes those claims in this case, they will not be considered here.  *Mills v. Beitzel*, *et al.*, SAG-22-2805, another related case, is pending before Judge Gallagher.

("ADA"), as amended, 42 U.S.C. § 12101 *et seq*.  He seeks compensatory damages as well as injunctive and declaratory relief.  ECF 1-2 at 8, 54-64.

Mills names as defendants Larry Hogan, the former Maryland governor; Robert Green, Secretary of the Maryland Department of Public Safety and Correctional Services ("DPSCS"), O. Wayne Hill, Deputy Secretary for Operations; Frank Bishop Jr., Assistant Commissioner of the Division of Correction ("DOC"); Jennifer Schmitt, Director of Case Management; F. Todd Taylor, Executive Director of the Inmate Grievance Office ("IGO"); Robin Woolford, IGO Deputy Director; Correctional Officer Major Walter Iser; and Correctional Officer Lieutenant William Thomas.  I shall refer to these defendants collectively as "Correctional Defendants."[2]  In addition, plaintiff sued Corizon Health Incorporated ("Corizon") and Janette Clark, NP.

Defendant Clark, joined by YesCare Corp. ("YesCare"), which was not named as a defendant, filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, alternatively, for summary judgment under Rule 56.   ECF 13.  It is supported by a memorandum (ECF 13-1) and exhibits. *See* ECF 13-3; ECF 13-4.

Counsel explains that YesCare was formerly known as Corizon Health, Inc.  ECF 13-1 at 1.[3]  Although counsel has not formally moved to substitute YesCare for Corizon under Fed. R. Civ. P. 25(c), it appears that this is the intent.  And, Mills seeks to add both YesCare and Tehum Care Services, Inc. ("Tehum"), as defendants.  ECF 30.  He claims that YesCare is part of Tehum.

Given the filing of a dispositive motion by counsel for YesCare, and Mills's desire to add YesCare as a defendant, the Clerk shall be directed to add YesCare to the docket as a defendant.

---

[2] Defense counsel points out that some of these defendants may have had different titles in 2019.  *See* ECF 17-1 at 2.

[3] Corizon is in bankruptcy.  Therefore, the case has been stayed as to Corizon, due to its bankruptcy filing.  *See* ECF 20, ECF 21.

And, because there is no information before the Court that YesCare is entitled to a bankruptcy stay, the case shall not be stayed as to YesCare. As to Mill's desire to add Tehum as a defendant, he has not provided any factual allegations about Tehum to warrant its inclusion in this case. Therefore, I shall deny Mills's request (ECF 30) to add Tehum as a defendant or to otherwise stay the case.

In view of the foregoing, I shall refer to YesCare and Clark collectively as the "Medical Defendants." And, I shall refer to ECF 13 and ECF 13-1 as the "Medical Defendants' Motion."

The "Correctional Defendants" also moved to dismiss or for summary judgment. ECF 17. Their motion is supported by a memorandum (ECF 17-1) (collectively "Correctional Defendants' Motion") and numerous exhibits, including NBCI records. These include the declarations of Larry Gilpin (ECF 17-4); J. Harr (ECF 17-5); J. Frantz (ECF 17-6); Cody Gilpin (ECF 17-7); W. Iser (ECF 17-8), as well as exhibits regarding Mills's adjustment history, DOC policies, and Mills's administrative remedies. ECF 17-3 and 17-9.

Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), on October 12, 2022 and December 13, 2022, the Court informed Mills of his right to respond to the motions, and that the failure to file a response in opposition to the motions could result in dismissal of his Complaint. ECF 14, ECF 18. Mills filed an opposition to the Medical Defendants' Motion. ECF 16. He also moved for an extension of time to respond to both motions. ECF 19. In both submissions (ECF 16, ECF 19), Mills requested an opportunity to conduct discovery.

By Memorandum and Order of April 7, 2023, I denied Mills's request for discovery. ECF 22; ECF 23. But, I granted him an extension of time to file additional responses to the

dipositive motions. *Id.* Thereafter, Mills sought and received an extension of time, to and including July 5, 2023, to file his opposition. ECF 26; ECF 27.[4] He did not respond further.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6 (D. Md. 2023).  For the reasons that follow, I shall construe the motions as ones for summary judgment and grant them.

## I.  Factual Background

A.  Mills's Allegations

On July 3, 2019, Mills advised prison staff who were responsible for food distribution that he was engaged in a Christian fast. ECF 1-2 at 12. At the time, Mills was 59 years of age.  *See*, *e.g.*, ECF 13-4 at 45.

Mills claims that Iser and Thomas put him in an isolation cell on staff alert, with a plexiglass shield in front of his door, to "punish" him for "Christian fasting."  ECF 1-2 at 14; *see*

---

[4] The Court received correspondence from Mills on July 14, 2023, in which he states that he did not receive a response to his request for extension of time, and he requested verification that the Court had received his Motion.  ECF 31. In response to that inquiry, the Clerk sent a copy of the docket sheet to Mills.

In a supplement to his motion for extension of time (ECF 29), Mills indicates he needs more time to conduct research in order to respond to the pending dispositive motions, stating that "it can take from 9 months to 1 year to get case law and I have no law library to help me…." ECF 29 at 4. The Correctional Defendants responded to Mills's filing (ECF 32), providing a Declaration from Rebecca Hammons, Correctional Librarian at NBCI, explaining that inmate requests for case law are processed through the Library Assistance to State Institutions ("LASI") and that LASI requests can be submitted through the prison library or, for inmates housed on segregation or otherwise unable to attend the library in person, they can request delivery of LASI forms to their cell and then can complete and submit the forms to their tier officer or case manager for delivery to the library.  ECF 32-1, ¶ 3. LASI requests are typically fulfilled within four to six weeks. *Id.* ¶ 4.

Between January 1, 2023 and July 19, 2023, Mills did not submit any LASI requests or requested delivery of LASI to his cell. *Id.* ¶ 5. To the extent that Mills's additional filings were intended to be motions for extensions of time, they are denied.

*id.* at 13-14.  He also asserts that Nurses Holly Pierce[5] and Janette Clark "subject Mills to hunger strike or starvation policies and procedures . . ." because they forced Mills "to review" the DPSCS form on effects of starvation and consent to treatment. ECF 1-2 at 14.  Mills states that he refused to sign the form but Clark "use[d] forgery" and told Mills that his Christian fast was not healthy. *Id*. at 15. Mills states that fasting is "a godly practice" and it "has been used for thousands of years for health and spiritual wellbeing . . . ." *Id*. at 15-16.

Mills alleges that unidentified staff used threats and intimidation toward him regarding his Christian fast and tried to talk him out of the fast.  *Id.* at 17. He states that on July 16, 2019, he was taken out of his cell and placed in a holding cell, where Lt. Whiteman and Officer Yutzy tried to force him to break his fast by keeping him in the holding cell for three days. *Id*. at 18. He also claims that Officer Thomas tried to talk him out of his fast and that Whiteman, Thomas, and Iser are responsible for his being held in the holding cell. *Id*. at 19.

In addition, Mills claims that because Pierce was "mad" at him for fasting and because Pierce "hates" him, she sent him to the hospital on July 19, 2019, despite his being in "great health". *Id*. at 19-20.  According to Mills, from July 19 to July 25, 2019, staff in the hospital, including Officer Roby, as well as Pierce and Clark, tried to talk him out of his fast, using threats and intimidation.  *Id.* at 20-21.  Moreover, he asserts that Clark lied to him while he was in the hospital, because she told him his kidneys were failing, but he later learned that was not true. *Id.* at 24.

On July 25, 2019, Mills had a conference with medical and psychological staff including mental health counselor L. Beitzel, and they allegedly used threats and intimidation as a means to

---

[5] Pierce is also known by the surname of Hoover.  Pierce is not named as a defendant in this case.

force him to break his fast. *Id*. at 22. Mills states that he ended his fast on that date because he heard God's call to end the fast. *Id*. at 23. He reports that he fasted for a total of twenty-two days and, during that time, he was subjected to death threats, hostility, and intimidation by correctional and medical staff.  ECF 1-2 at 23.     However, he states that there was no medical evidence that the fast had a bad effect on him and that his body adjusted to the fast, gave him blessings, and cleansed his body of toxins. *Id*. at 25.

Mills states that he submitted an administrative remedy ("ARP") dated August 1, 2019, to Bishop, who was the Warden of NBCI at the time, but Bishop ignored the ARP. *Id*. at 26.  Mills sent an appeal to Hill on September 1, 2019.  *See* ECF 17-9 at 3.  Schmitt, the ARP Coordinator, responded.  ECF 17-9 at 2.  He said that the appeal would not be accepted for processing and sent it back to Mills on September 9, 2019.  *Id.*

On September 30, 2019, Mills submitted a grievance to Neverdon, then the Executive Director of the IGO.  *Id*. On November 4, 2019, Woolford told Mills that he did not get copies of the administrative remedy and appeal that Mills claims to have sent him.  Mills claims that he sent the copies to Taylor on May 21, 2020, but did not receive any response to the grievance.  According to Mills, this means the grievance was dismissed by Woolford, Todd, Green, and Hogan. *Id*. at 27-28.

Further, Mills contends that he should be able to hold a Christian fast on disciplinary segregation at all times. *Id*. at 28. He asserts that he has "severe mental illnesses," *id.* at 28, and staff are aware of his condition, but "abuse" him for his Christian fast, in violation of the Eighth Amendment. *Id.* at 29; *see id.* at 31, 35.  He also asserts "instances of negligent deeds" by Iser, Thomas, and Clark, as well as deliberate indifference.  *Id.* at 32.

In addition, Mills claims that the alleged abuse violated his right to the free exercise of religion under the First Amendment. *Id.* at 41. According to Mills, when Iser placed him in a holding cell this put "substantial pressure" on him to modify his behavior and violated his beliefs. *Id*. at 42.  He adds that Iser's abusive  conduct amounts to a violation of his right to be free from retaliation under the First Amendment. *Id*. at 43-44.

Moreover, Mills asserts that "no qualified individual (Mills) with a disability (severe mental illness) . . . shall be excluded from, (Christian fasting) denied the benefits of (Christian Fasting) or be subjected to discrimination." *Id.* at 44-45.  Generally, he claims that he has been denied benefits,  subjected to discrimination, and has not been permitted to participate in a program or activity due to his Christian fasting. *Id*. at 45. And, he claims that Iser violated his rights under the Rehabilitation Act by abusing him for his Christian fasting; that Iser knows that Mills suffers from severe mental illness; and Iser did not provide a reasonable accommodation to allow Mills to complete his Christian fasting. *Id*. at 46-47.

In general, Mills alleges that Iser, Thomas, Clark, Hill, Bishop, Schmitt, Taylor, Woolford, Green, and Hogan participated in the constitutional and statutory violations by ignoring his ARP. not accepting his appeal, and dismissing his grievance. *Id*. at 47-48. He claims that after being advised of the issue regarding his fasting, they failed to remedy the wrong. *Id*. at 49.

Mills also alleges that the Correctional Defendants created a policy or custom to abuse Mills for his Christian fasting, and that Bishop, Hill, Green, and Hogan were grossly negligent in supervising their subordinates. *Id*. at 51. Moreover, he claims that Corizon has a policy, custom, or practice of abusing him for Christian fasting. *Id*. at 53.

B.     Correctional Defendants' Response

The Correctional Defendants explain that on June 20, 2019, Mills was to be transferred to a new cell based on directives from his mental health treatment team to house Mills with another inmate, rather than have him remain single-celled.  But, Mills refused a direct order to be handcuffed to effectuate the move.  ECF 17-3 at 2-3 (Decl. of Benjamin Bradley, Case Management Specialist), ¶ 3; ECF 17-3 at 4-13 (Notice of Inmate Rule Violation ("NOIRV") dated June 20, 2019, and Inmate Hearing Record for Case No. 2019-089).  Given Mills's refusal to be handcuffed, Officer D. Self issued a Notice of Inmate Rule Violation to Mills, and Mills was then placed on Administrative Segregation Pending Adjustment ("ASPA"). *Id*. at 4.  Mills's refusal to sign the receipt for service of the rule violation charge was documented by two officers. *Id*. at 6.

An adjustment hearing was held on July 2, 2019. *Id*. at 7. During the hearing, Mills stated that he was a special needs unit ("SNU") inmate who came on the unit assigned to a single cell, did not want to be double celled, did not have to move, and wanted to talk to his treatment team and review the treatment plan before any move. *Id*. at 8.  However, Mills did not deny refusing the orders to be handcuffed or to move his cell.  Nor did he produce any evidence that he had an order to be single celled. *Id*.

Hearing Officer Farris found that Mills violated Rule 316 by refusing to obey an order and sanctioned him with fifteen days of disciplinary segregation, beginning June 20 and ending July 4, 2019.  *Id*. at 9-10.  Mills appealed the decision to the Warden.  *Id.* at 11.  The Warden affirmed the hearing officer's decision.  *Id*. at 12.

Correctional Officer II Larry Gilpin went to Mills's cell on July 4, 2019, because he was scheduled to come off of segregation and return to general population. ECF 17-3 at 14 (NOIRV).  Mills refused to be handcuffed so that he could be escorted to another cell. *Id*.  Gilpin issued a NOIRV for disobeying an order. *Id*; *see also* ECF 17-4 (Decl. Gilpin), ¶¶ 5, 6. The shift supervisor

reviewed the NOIRV and recommended a formal hearing and that Mills be housed on ASPA. ECF 17-3 at 14.  CO Jon Harr attempted to serve Mills with a copy of the NOIRV that same day but Mills refused to sign the receipt.  *Id*. at 15; *see also* ECF 17-5 (Decl. of Harr), ¶¶ 4, 5.

On July 11, 2019, COII Jason Frantz was assigned to escort inmates to the hearing room for adjustment hearings.  ECF 17-6 (Decl. of Krantz), ¶ 4.  Frantz contacted Mills, who advised that he did not want to attend the hearing.  *Id.*  But, Mills refused to sign a Waiver of Appearance form. *Id.*  Frantz completed the form, indicating Mills's refusal to sign, and Frantz signed the form himself under the penalty of perjury.  *Id.* ¶¶ 5, 6; *see also* ECF 17-3 at 17 (Inmate Hearing Record receipt of service form).  Frantz advised Gilpin, who was the institutional representative attending the hearings on that date, and Hearing Officer Jamie Farris, of Mills's refusal.  ECF 17-6, ¶ 7.

During the hearing, Gilpin acted as the representative for DPSCS.  Mills did not make any request for witnesses or seek to present evidence. ECF 17-3 at 19-20; ECF 17-7 (Gilpin Decl.), ¶¶ 4, 5.

Farris conducted the hearing in absentia.  Based on the sworn statement contained in the NOIRV of July 4, 2019, completed by Gilpin, and the fact that Mills remained "in the same cell he was housed in at the time of this incident," when he refused the order to be handcuffed, Farris found Mills guilty and sanctioned him with 30 days of disciplinary segregation.  ECF 17-3 at 19-21 (adjustment hearing record).

Mills appealed the disciplinary decision to the Warden, who affirmed the decision. ECF 17-3 at 24.  Further, Mills appealed the decision to the Office of the Commissioner of the Division of Corrections.  Chief Hearing Officer Kimberly Steward reversed the conviction and vacated Mills's disciplinary segregation sanction.  *Id.* at 28.  Based on the records forwarded to the

Commissioner's office, she found the record insufficient "to support a finding that inmate Mills voluntarily waived his right to appear at his disciplinary hearing." *Id*.

While Mills was assigned to segregation, he engaged in a "Christian fast" and demanded placement in a single cell.  According to the Correctional Defendants, the fast lasted from June 29 to July 25, 2019. ECF 17-3 at 35 (hunger strike log); *see also* ECF 17-1 at 6.

On July 18, 2019, Mills was transferred from NBCI to the prison hospital, also called an infirmary, located at Western Correctional Institution ("WCI"), where he remained until July 25, 2019.  ECF 17-3 at 2 (Bradley Decl.), ¶ 3; ECF 17-3 at 31-34 (Segregation Log); ECF 17-1 at 3, 6.  Plaintiff ended his fast because he "hears God's call to end it."  ECF 1-2 at 23.  He returned to a disciplinary segregation cell at NBCI on July 25, 2019.  ECF 17-3 at 34.

Iser avers that, pursuant to DPSCS policy, after Mills refused three meals, medical staff were notified of Mills's hunger strike and his demand to be placed in a single cell.  ECF 17-8 (Iser Decl.),  ¶ 2.  Also pursuant to DPSCS policy, during Mills's fast, he was offered a meal tray at each designated mealtime.  *Id.* ¶ 3.

On June 30, 2019, Mills "was placed under medical monitoring" because of "the effects" of starvation. *Id*. ¶ 2.  While Mills refused to eat, which Mills indicated was due to a religious fast, he demanded a "permanent single cell."  *Id*.

Medical staff recommended Mills's transfer to the WCI Infirmary, and Mills was transferred there on July 18, 2019.  *Id*.  They also provided Mills with "The Effects of Starvation and Consent to Treatment Form," and counseled Mills as to the serious risks to his health from long term fasting. *Id*. ¶ 3; *see also* ECF 13-4 at 159 (the Form); ECF  17-3 at 100-106 (DPSCS "Hunger Strike (Declared/Undeclared) And Starvation" Policy).  In particular, pursuant to DPSCS

policies, Mills was counseled regarding the risks of damage to his kidneys and liver and even death. ECF 17-8, ¶ 3.

Iser denies that he ever threatened, harassed, or retaliated against Mills for his hunger strike/religious fast. *Id.* ¶ 4. Moreover, he does not believe any other staff ever did so. *Id.*

Defendants assert that there is no evidence that Mills submitted an ARP on August 1, 2019. ECF 17-3 at 1-2, ¶¶ 3, 4. Review of ARP complaints filed by Mills between June and September of 2019 reveal that he did not file any ARPs complaining of threats, retaliation, or harassment or alleging matters regarding a religious fast or hunger strike. ECF 17-3 at 1, ¶ 3. The only ARP filed by Mills during this time was ARP NBCI 1681-19, filed on August 13, 2019, complaining of spiders in his general population cell. ECF 17-3 at 2, ¶ 4; ECF 17-3 at 36-37.

On September 9, 2019, Schmitt returned Mills's ARP "appeal," which was filed with the Commissioner of Corrections. ECF 17-9 at 1. Mills was advised that if he was attempting to appeal the institutional decision or lack of decision he needed to file an "Appeal of Procedural Dismissal/Warden's Response/No Response" using the appropriate forms. *Id.* Further, he was reminded that since 2010 he had filed nine appeals and that the procedure established for filing an ARP had not changed. Plaintiff was specifically told that if he wished to appeal an ARP he had to include with the appeal an original completed request for ARP, including Part C and/or the Warden's response. *Id.* Mills did not cure the deficiencies noted by Schmitt.

C.    Medical Defendants' Response[6]

Clark holds dual master's degrees as a Clinical Nurse Specialist and an Acute Care Nurse Practitioner ("ACNP"). ECF 13-3 (Decl. of Clark), ¶ 2. She is also a board certified ACNA. *Id.*

---

[6] According to ECF 13-4, numerous health care providers interacted with Mills. But, Clark is the only individual medical defendant.

In addition, she has a post-master's certificate as a Psychiatric Mental Health Nurse Practitioner and is a Registered Nurse. *Id.* She provided medical care to plaintiff at WCI. *Id.*

Clark avers that she never interfered with Mills's free exercise of his religion. *Id.* ¶¶ 2, 5. She explains that as a medical provider her job is to ensure the health and safety of patients, including when they refuse to eat, regardless of the basis for that refusal. *Id.* ¶ 5. She claims that all medical providers encouraged Mills to eat and drink because starvation can cause many negative health consequences, including death. *Id.* Although Mills contends that he did not suffer ill effects from his fast, Clark explains that is not accurate: his blood work became abnormal and he lost a significant amount of weight in a short period of time, which is unhealthy. *Id.*

Clark states that she is not aware of any specific Corizon policy regarding hunger strikes or religious fasts, but she followed DPSCS policy in treating Mills. *Id.* ¶ 6. She explains that custody staff is required, per the policy, to report to medical when an inmate misses a specific number of meals, regardless of the reason the meals were missed. *Id.* Once made aware that an inmate is not eating, nurses and other medical providers are required to monitor the patient each shift, including taking vital signs, ordering and reviewing lab work for changes, and assessing the inmate's overall health.

Additionally, medical staff are required to explain to the patient the effects of starvation on the body, making sure the patient understands those consequences by having the patient review and sign "The Effects of Starvation and Consent to Treatment Form" and encouraging them to eat and drink. *Id.* However, medical staff do not force any patient or inmate to eat, absent a court order, but can administer IV fluids if the patient agrees. *Id.*

Mills's medical records demonstrate that he has a mental health diagnosis of chronic schizophrenia, disorganized type. ECF 13-4 at 3. On January 30, 2019, Mills was seen by Dr.

Vincent Siracusano for psychiatric follow up and medication management. *Id*. at 4.  At that time he had a diagnosis of psychotic disorder and was prescribed Haldol and Cogentin. *Id.* Mills reported that he was compliant with his medications and he appeared stable. *Id*.

On April 12, 2019, Mills was again seen by Dr Siracusano for psychiatric follow up. *Id*. at 10.  Mills was upbeat but "religiously preoccupied."  He cited Bible passages frequently and it was noted that studying the Bible appeared to provide Mills comfort and joy. *Id*.  On June 22, 2019, Dr. Siracusano noted that Mills was transferred to Housing Unit 1 from Housing Unit 2 because he refused a cell change. *Id.* at 20.

Mills was seen by Robin Shively, R.N. on June 30, 2019, after custody staff brought him to medical because he was not eating.  Mills reported that he was not eating for religious reasons and he wanted to continue having a single cell. ECF 13-4 at 17.

Also on June 30, 2019, Mills was seen by Clark. *Id.* at 18. Mills advised Clark that he heard he was going to be double celled and he had not been double celled for a long time, so he went on a spiritual fast. *Id*.  Clark asked Mills about his fast and how he would know it should end.  Mills responded that Moses and Jesus fasted for 50 days, David fasted for three days, and they all lived. *Id*.  He stated he was drinking water but not eating.  His speech was clear but tangential and Mills talked about Hills's housing status back to 2015. *Id*.

Clark gave Mills the form titled "The Effects of Starvation and Consent to Treatment" (the "Form"), which he read.  Clark advised Mills that not eating or drinking could cause heart/kidney failure, loss of limbs and ultimately death.  She encouraged him to eat and drink.  At that time, Mills was 6'1" and weighed 173 pounds.

Mills signed the "Effects of Starvation and Consent to Treatment" Form on June 30, 2019. ECF 13-4 at 159.  The form describes the consequences of not eating, including that prolonged

starvation can result in serious harm to a person, including death. *Id.* ECF 13-3, ¶ 11; ECF 13-4 at 159.

According to the Form, when a person experiences an intake deficit, the body draws on its stores to maintain blood glucose, which is the fuel for the body. *Id.* The body will first use stored fat. *Id.* But, when fat stores are exhausted the body will use muscle and organ tissue to produce energy. *Id.* As this occurs, muscles waste away, along with tissues of the liver and intestines, and the heart decreases in size and output. *Id.* Blood pressure and respiratory rates are reduced and cardio respiratory failure can eventually occur. *Id.*

In addition, as a result of starvation, the skin becomes thin, dry, inelastic, and cold, with possible protrusion of bones. *Id.* A patchy brown pigmentation may also occur. *Id.* Apathy and irritability in mood are also common. *Id.*

The Form also explains that proteins are essential for maintaining cellular function. *Id.* And, when the body's proteins have been depleted to half their normal levels, death ordinarily occurs. *Id.*

Clark explains that certain lab values are monitored when a patient is not eating, which can indicate damage. ECF 13-3, ¶ 12. Brain and heart function decrease when sodium and potassium levels are low. BUN and creatinine levels, which indicate kidney function, and AST and ALT, which indicate liver function, are also monitored. *Id.* Hemoglobin and hematocrit are monitored for anemia. The white blood cell count is monitored because an elevated level during starvation is a reaction to the inflammatory response. *Id.*

NP Holly Pierce saw Mills on July 1, 2019, for monitoring. ECF 13-4 at 26. Mills reported that he was engaged in a Christian fast to obtain a single cell. He indicated that he was drinking water but had not eaten for two days. *Id.* Despite being educated as to the risks of fasting he stated

he would continue the fast. He weighed 172.4 pounds. *Id.* The following day, Pierce again saw Mills for monitoring. *Id.* at 28. He reported he would continue his fast. He weighed 172 pounds. *Id.* Labs were drawn: sodium, chloride, and carbon dioxide were low and creatinine and bilirubin were high. *Id.* at 154-58.  Mills was again seen by Pierce at his cell door on July 3 and 4, 2019. *Id.* at 30-31.

R.N. Michal Klepitch saw Mills on July 5, 2019, and Mills reported:  "My eyes are getting bad." ECF 13-4 at 33. Mills was alert and oriented but weak and had difficulty walking to medical. He stated he would continue his fast.  He denied chest pain or shortness of breath, and he reported drinking some water. *Id.*

The following day, Mills saw Clark in the medical room. ECF 13-4 at 37. Mills reported he was drinking plenty of water.  Clark could smell ketones on his breath.  Mills debated whether ketosis was a good thing and referenced a medical manual he had read and encouraged Clark to read it. *Id.*  He could speak clearly and in sentences.  Clark did not observe any body odor and Mills's oral care was described as fair to poor.  He was breathing normally.

Clark asked Mills if he was prepared to die if he continued his strike and he said no.  Clark advised him that his heart/kidneys could fail and he could ultimately die, and she told him to eat and drink plenty of water. *Id.*  Clark was concerned that Mills was taking Haldol during a hunger strike and during the heat of summer and sent this information to the psychiatric nurse for follow up. *Id.*  Mills weighed 169.2 pounds. *Id.* at 38.

On July 7, 2019, Clark again saw Mills. ECF 13-4 at 43. He stated that he "'heard' someone say that he was going to be double celled." *Id.*  He appeared to be dehydrated, as his oral mucous membranes were dry and his lips were slightly cracked. *Id.*  However, Mills claimed he was drinking "plenty of water." *Id.*

15

Clark and Mills again discussed the consequences of starvation.  Mills was reminded that he could ultimately die and was asked if he was prepared to continue his fast until that happened. Mills "thought for a moment" and then said "he did not believe God would let that happen." *Id.* Rather, he believed that "getting a PERMANENT single cell would happen." *Id*.

Although Mills reported that lab work was drawn the previous week, Clark was unable to find any lab results.  She encouraged Mills to drink more water and eat. He told her he would drink more water "but was going to continue his spiritual fast to get a single cell." *Id*. He weighed 166.4 pounds. *Id.* at 44.

The following day, Pierce saw Mills through the cell door for monitoring. ECF 13-4 at 45. He continued his fast but was drinking water. He again requested a single cell. He did not appear in distress and walked without difficulty.

That same day, LGSW Misty Guthrie saw Mills for counseling. *Id.* at 47.  She noted that Mills was in HU 1 because he refused housing and was on a "hunger strike." *Id.*  Mills maintained that he had been told by several clinicians that "he would always be in a single cell."  Guthie stated, *id.*:  "We processed that none of these clinicians are working here any longer." *Id.*  But, plaintiff also claimed that Dr. Siracusano told plaintiff the last time they met that he would be in a single cell. *Id.*  Yet, he was now told that he was to be double celled. *Id.*  He stated that he was on a religious fast and felt "God will provide him with a single cell." *Id*.

Pierce saw Mills through his cell door on July 10, 2019, because he refused to report to medical. ECF 13-4 at 52. He was still fasting but said: "I am ready [to eat] just give me my paperwork." *Id.* (alteration in original).  Pierce noted that she completed "[p]atient education regarding the indication for a single cell." *Id.*  Mills disagreed, but stated he would continue to "drink." *Id*. Pierce saw Mills again the next day through his cell door. *Id*. at 53. He reported he

would continue to refuse to eat or report to medical until he received his paperwork.  And, Pierce again educated Mills on the complications associated with starvation.  *Id.* Mills replied that he would report to medical the following day if he got his paperwork.  *Id.*

On July 12, 2019, Pierce saw Mills in medical for monitoring.  *Id.* at 55.  Mills reported that he drank water but continued to refuse meals. He weighed 161.4 pounds. *Id.*  His lab work was stable and he was again advised regarding the risks of starvation. *Id.*  The next day he again saw Pierce for monitoring. *Id.* at 57. He continued to drink water but refused meals. He was able to walk without difficulty and his mucous membranes were moist.  His weight was unchanged. He was again educated on complications of starvation. He "verbalized" his understanding but said he would see Pierce in court. *Id.*

Lab work was drawn.  The lab results showed that Mills's sodium and chloride levels were low and his bilirubin was high. *Id.* at 111-112

Kimberlie Ventura, R.N. saw Mills on July 14, 2019, through his cell door. ECF 13-4 at 59.  Once again Mills reported he was drinking plenty of water and offered no complaints. He advised he was fasting for religious reasons and was on a "Moses diet." He refused to have his vital signs checked. *Id.*

Pierce saw Mills on July 15 and 16, through his cell door. *Id.* at 60-61, ¶ 25. He continued to drink water but refused meals. He did not appear in distress. *Id.*

On July 17, 2019, Pierce saw Mills in medical.  ECF 13-4 at 63. He reported that he was drinking fluids but refusing meals. He declined a physical assessment. He appeared unsteady when walking. His mucous membranes were moist but he appeared "overall unhealthy." *Id.*  He refused to have his vital signs taken.  Notably, Pierce directed that Mills be admitted to the infirmary. *Id.*

The following day, Mills fainted while providing blood and urine samples. ECF 13-4 at 65. Hoover was notified and she recommended he be encouraged to take fluids. *Id.* She also suggested monitoring of his vital signs while they awaited the results of the lab work. *Id.* The lab work showed several abnormal values, indicating the starvation was having a negative effect on Mills's body. *Id.* at 156-58; ECF 13-3, ¶ 27.

On July 19, 2019, Clark saw Mills in the infirmary. ECF 13-4- at 70. During discussion of Mills's fast, it seemed to Clark that Mills believed that "prior to 40 days he will be granted his 'permanent single cell.'" *Id.* Mills claimed that he had always been in a single cell and he would not stop his fast until he received paperwork for a permanent single cell.

Clark again educated Mills on the complications of not eating, including heart and kidney failure, loss of limb, and untimely death. He stated he understood but did not believe God would allow that to happen. *Id.* He again stated he was drinking water and was not hungry. His mucous membranes were slightly dry. He reported he had not had a bowel movement since he started his fast but was urinating. He admitted feeling dizzy occasionally. *Id.*

Clark again saw Mills in the infirmary the following day. ECF 13-4 at 72. He was awake and alert and provided details of conversations he had back to 2008 regarding his single cell. He denied shortness of breath, chest heaviness, or nausea. He was drinking water. Clark reviewed the recent lab reports. Mills agreed to IV fluids and, after Clark ordered them, they were provided. *Id.* at 73. She also noted she would request a patient care conference with psychology and custody in light of Mills's belief that God would give him a permanent single cell if he continued his fast. *Id.* at 72.

On July 21, 2019, Clark again saw Mills in the infirmary. ECF 13-4 at 82. He was drinking water and had received IV fluids the previous day. He stated that he felt much better. Mills was

awake and alert and able to stand to be weighed.  He again wanted to explain all the conversations he had with staff in the past regarding a single cell and stated he had no intention of eating until he was given a permanent single cell.  Mills was able to recite the consequences of not eating but he did not believe that God would let that happen. Clark encouraged him to eat and continue to drink water. *Id*.

Pierce saw Mills in the infirmary on July 22, 2019. ECF 13-4 at 88. He was argumentative and believed Pierce prescribed a different inmate a permanent cell for his mental health disorder. Pierce again educated Mills on the risks of not eating and Mills again stated he would continue his fast as God would give him what he needed. *Id.*   Mills's lab work again showed several abnormalities. *Id*. at 218-30.

The following day, Burnice Swan, R.N. saw Mills in the infirmary. ECF 13-4 at 95. Mills was oriented to place, person, and situation, but not to time.   *Id*. at 96.  He was unclear as to day, month, or year.   *Id.*  He also had a flat affect.   *Id.*  Moreover, he had auditory hallucinations and obsessive thoughts. *Id.*  Swan noted that Mills had hallucinations/delusions that God had spoken to him and told him to fast in order to obtain a single cell. *Id*.

Pierce also saw Mills in the infirmary that day. *Id.* at 97.  Mills continued to seek an order for a single cell.  He reported drinking fluids and did not express any medical concerns. *Id*.

The following day, Pierce again saw Mills in the infirmary. *Id.* at 106. He reported drinking fluids but complained of dry skin and itching. He appeared thin and chronically ill. He was prescribed Lubriderm for his complaints of dry skin. *Id*.

On July 25, 2019, Brenda Reese, R.N., Director of Nursing, entered an "Administrative Note" regarding a patient care conference held with multiple health care personnel and Mills to discuss Mills's "'religious fast,'" which she said began on July 3, 2019.  ECF 13-4 at 119. She

recounted that Mills "was verbal" in expressing "what he wanted in order to stop the strike/fast." *Id.* He was again advised of the serious complications of starving his body and the measures that would be taken to help him through his situation.

Notably, the team offered Mills a single cell on the SNU tier for one year, to which Mills agreed. *Id.* He returned to the infirmary, where he accepted a meal and ate all of it. *Id.* He was "discharged back to NBCI per NP Pierce." *Id.*; *see also id.* at 113.

When Mills arrived at NBCI he saw Kimberlie Ventura, R.N. ECF 13-4 at 115. He was alert, oriented, and offered no complaints. He denied suicidal ideations and stated he was eating and drinking and no longer on a hunger strike. *Id.* He weighed 152.2 pounds. *Id.* He had a steady gait when he walked down the hall to his cell. *Id.* However, the following day, Mills refused to report to medical for his scheduled visit. *Id.* at 120.

## II.     Standards of Review

### A.

Mills is self-represented. Therefore, his submissions are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); see Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *accord Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)), *cert. denied*, 541 U.S. 1042 (2004).

**B.**

Defendants' motions are styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.,* 510 F.3d 442, 450 (4th Cir. 2007).  Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland,* 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam).

A court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so.  *See Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.,* 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give

notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).  However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin,* 149 F.3d at 261.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.).  But, this discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id.* at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Shaw v. Foreman*, 59 F.4th 121, 128 (4th Cir. 2023) (4th Cir. 2023); *Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.   Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).   "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"   *Scott v. Nuvell Fin. Servs., LLC,* 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 F. App'x 378 (4th Cir. 2013) (per curiam).   A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"   *Harrods*, 302 F.3d at 244 (citations omitted).   But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.   And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

The Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit.'" *Harrods*, 302 F.3d at 244 (internal citation omitted).  Nevertheless, the Court has "not always insisted" on a Rule 56(d) affidavit.  *Id.*  Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se."  *Putney*, 656 F. App'x at 638.

On the other hand, "[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of [Rule 56(d)] to set out reasons for the need for discovery in an affidavit."  *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) (citing *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 215 (4th Cir. 1993)); *see also Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 972 n.3 (4th Cir. 1990) ("[I]f plaintiffs genuinely were concerned that defendant's motion was premature, plaintiffs should have sought relief under Fed. R. Civ. P. 56[(d)].").

As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask."  *McCray*, 741 F.3d at 483; *accord Putney*, 656 F. App'x at 639.  And, the Fourth Circuit recently reaffirmed this principle when it concluded that a district court abused its discretion by granting summary judgment before discovery, even though the plaintiff failed to

24

comply with Rule 56(d), because "the district court was on fair notice of potential disputes as to the sufficiency of the summary judgment record." *Shaw*, 59 F.4th at 129.  In *Shaw*, much of the evidence the plaintiff needed involved the subjective knowledge of the prison officials or was in their exclusive control. *Id.*; *see also Pledger v. Lynch*, 5 F.4th 511, 526 (4th Cir. 2021).

Mills requested discovery, which I denied.  ECF 22.   In particular, Mills sought his entire medical and psychiatric file as well as video surveillance of the tier where he was held.  In denying the discovery request, I noted that defendants provided a large portion of Mills's medical records and that the video evidence requested was not necessary to his opposition, as it would not prove the facts he claimed and involved actions by staff who were not parties to this case. *Id.* at 4-5.  In particular, the medical records consist of almost 160 pages.  *See* ECF 13-4.  I note, too, that the Correctional Defendants provided extensive exhibits.  *See* ECF 17-3, ECF 17-9.  These were all made available to plaintiff.

Further, Mills was present during the incidents at issue and thus what took place is within his personal knowledge.  Indeed, testimony based on personal knowledge or firsthand experience can constitute evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 Fed. App'x 209, 212 (4th Cir. 2017).

Accordingly, with the exception of exhaustion under the PLRA, and the claims under the ADA and the Rehabilitation Act, I am satisfied that it is appropriate to address the motions as ones for summary judgment, as this will facilitate resolution of this case.

## C.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *In re Birmingham*, 846 F.3d 88, 92 (4th

Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir.  2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317-18 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint

26

for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *Kolon Indus., Inc.*, 637 F.3d at 440); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009).

Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *Kolon Indus., Inc.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger*, 510 F.3d at 450.

However, under limited circumstances, when a court is resolving a Rule 12(b)(6) motion, it may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor and City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (internal citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

"[B]efore treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F. 3d at 167.  "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.*  Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  *Id.* at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Vol. Fire Dep't.*, 684 F.3d at 467.  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").  "As examples, 'courts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that constitute the core of the parties' contractual relationship in a breach of contract dispute.'"  *Chesapeake Bay Found.*, 794 F. Supp. 2d at 611 n.4 (quoting *Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, JFM-10-0206, 2010 WL 2732334, at *2 (D. Md. July 8, 2010)).

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). A court may also "take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x 200 (4th Cir.); *cf. Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) (holding that a district court may "properly take judicial notice of its own records").

However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

## D.

Summary judgment is governed by Fed. R. Civ. P. 56(a). It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S.

557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp*., 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248; *see Tom v. Hospitality Ventures, LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020).  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat*, 346 F.3d at 522 (quoting former Fed. R. Civ. P. 56(e)).  Moreover, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).

The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses'

credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).  Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

Thus, the trial court may not make credibility determinations on summary judgment. *Kellen v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's County*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts,* 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French,* 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

That said, "conclusory allegations or denials, without more, are insufficient to preclude" the award of summary judgment.  *Wai Man Tom*, 980 F.3d at 1037 (citation omitted).  Moreover, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'"  *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)).  And, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion."  *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *see*

*also, e.g.*, *Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co*., 499 Fed. App'x 285, 294 (4th Cir. 2012).

Notably, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). But, if testimony is based on personal knowledge or firsthand experience, it can constitute evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc*., 700 Fed. App'x 209, 212 (4th Cir. 2017). Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, 41 F. 4th 370, 383 n.8 (4th Cir. 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

In sum, to defeat summary judgment, conflicting evidence, if any, must give rise to a genuine dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Judd*, 718 F.3d at 313. On the other hand, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III.     Section 1983

Under 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Nieves v. Bartlett*, ___ U.S.

___, 139 S. Ct. 1715, 1721 (2019); *Filarsky v. Delia*, 566 U.S. 377 (2012); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).  "The first step in any such claim is to pinpoint the specific right that has been infringed."  *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'"  *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982).  A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326, (1941)); *see also Philips*, 572 F.3d at 181

(citations and internal quotation marks omitted) ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.").

An individual cannot be held liable in a § 1983 action under a theory of respondeat superior.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (determining that there is no respondeat superior liability under § 1983).  In *Iqbal,* 556 U.S. at 676, the Supreme Court said: "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."; *see also Younger v. Crowder*, ___ F.4th ___, 2023 WL 5438173, at *6 n.14 (4th Cir. Aug. 24, 2023); *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).  Thus, § 1983 requires a showing of personal fault based upon a defendant's own conduct.  *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights); *see also Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (same); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (same).  If a plaintiff has not alleged any personal connection between a defendant and a denial of constitutional rights, the claim against that defendant must fail.  *Vinnedge*, 550 F.2d at 928.

To be sure, a supervisor may be liable "for the failings of a subordinate under certain narrow circumstances."  *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013).  However, liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir.

2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020).

Thus, supervisory liability under § 1983 must be predicated on facts that, if proven, would establish that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

To qualify as "pervasive," a plaintiff must demonstrate that the challenged conduct "is widespread, or at least has been used on several different occasions."  *Shaw*, 13 F.3d at 799. Therefore, it is insufficient to point "to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence . . . . Nor can he reasonably be expected to guard against the deliberate [unlawful] acts of his properly trained employees when he has no basis upon which to anticipate the misconduct."  *Id.* (quoting *Slakan*, 737 F.2d at 373) (alteration added in *Slakan*).

A supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for § 1983 liability against that official for his deliberate indifference or acquiescence to "the constitutionally offensive conduct of his subordinates."  *Slakan*, 737 F.2d at 373; *see Shaw*, 13 F.3d at 799; *see also Younger*, *supra*, 2023 WL 5438173.  But, "a supervisor's mere knowledge" that his subordinates have engaged in

unconstitutional conduct is insufficient to give rise to liability; instead, a supervisor is only liable for "his or her own misconduct." *Iqbal*, 556 U.S. at 677.

Therefore, "to state a claim for supervisory liability, 'a plaintiff must plead that *each* [supervisory] defendant, through the official's *own individual actions,* has violated the Constitution.'" *Evans v. Chalmers*, 703 F.3d 636, 660–61 (4th Cir. 2012) (Wilkinson, J., concurring) (emphasis and alteration in *Evans*) (quoting *Iqbal*, 556 U.S. at 676). If a plaintiff makes "bare assertions" that amount to "nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim," the claim is insufficient. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 554–55); *see Langford v. Joyner*, 62 F.4th 122, 125 (4th Cir. 2023).

Of relevance here, "not all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (1995) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). A constitutional violation requires more than mere negligence. *See Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Indeed, "the Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied*, 529 U.S. 1067 (2000).

## IV.  Discussion

Mills alleges violations of the ADA, the Eighth Amendment, the First Amendment, RLUIPA, and the Rehabilitation Act.  ECF 1-2.

The Correctional Defendants advance a host of defenses.  They argue that they are immune from suit for claims asserted against them in their official capacity; they are entitled to qualified immunity; Mills has failed to state a claim under the statues or the Constitution; and Mills has failed to allege personal participation by the defendants in the events complained; and and Mills has failed to exhaust his administrative remedies.  ECF 17-1.

37

The Medical Defendants argue that the Rehabilitation Act does not apply to them; Mills fails to state a claim against them and, alternatively, they are entitled to summary judgment. ECF 13-1.

## A. Exhaustion

The Prisoner Litigation Reform Act ("PLRA") provides, in pertinent part, 42 U.S.C. § 1997e(a):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).

Mills's RLUIPA, ADA, and Rehabilitation Act claims, like all prison conditions claims, must be exhausted before they can be brought in federal court. *Germain v. Shearin*, 653 Fed. App'x 231 (4th Cir. 2016) (concluding that inmate who brought claim under RLUIPA failed to exhaust his administrative remedies as required by the PLRA); *Tillman v. Allen*, 187 F. Supp. 3d 664, 672 (E.D. Va. 2016) (dismissing RLUIPA claim for failure to exhaust under the PLRA); *Corpening v. Hargrave*, 2015 WL 2168907, at *2 (W.D. N.C. 2015) (concluding that the PLRA requires

exhaustion of administrative remedies before an action may be brought under any federal law, including the ADA and Rehabilitation Act).

The doctrine governing exhaustion of administrative remedies has been well established through administrative law jurisprudence. It provides that a plaintiff is not entitled to judicial relief until the prescribed administrative remedies have been exhausted. *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Therefore, a claim that has not been exhausted may not be considered by this court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007). In other words, exhaustion is mandatory, and a court ordinarily may not excuse a failure to exhaust. *Ross v. Blake*, 578 U.S. 632, 639 (2016) (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

However, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Bock*, 549 U.S. at 215-216; *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (recognizing that exhaustion provides prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process so

that the agency reaches a decision on the merits.  *Chase*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement so that the agency addresses the merits of the claim, but need not seek judicial review), *cert. denied*, 537 U.S. 949 (2002).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies.  *Moore*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he . . . PLRA amendment made clear that exhaustion is now mandatory.").   Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines."  *Woodford*, 548 U.S. at 88. This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'"  *Id.* at 91 (quoting *Pozo*, 286 F.3d at 1024) (emphasis in original).  But, the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials."  *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

Notably, an inmate need only exhaust "available" remedies.  *Younger v. Crowder*, ___ F.4th ___, 2023 WL 5438173, at *5 (4th Cir. Aug. 24, 2023); *see* 42 U.S.C. § 1997e(a).  The Fourth Circuit addressed the meaning of "available" remedies in *Moore*, 517 F. 3d at 725, stating:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.  *See Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are.  *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006).  Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively.  *Id.* at 87.  Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

In *Ross*, 578 U.S. at 635, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA."  In particular, it rejected a "special circumstances" exception to the exhaustion requirement.  *Id.* at 637.  But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'"  *Id.* at 635-36.  And, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."  *Moore*, 517 F.3d at 725.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play."  *Ross*, 578 U.S. at 643.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.*  Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."  *Id.* at 643-44.  The third circumstance occurs when "prison administrators thwart inmates from taking

advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

In Maryland, there is an established administrative remedy procedure that applies to all Maryland prisons. *See generally* Md. Code (2017 Repl. Vol.), §§ 10-201 *et seq.* of the Correctional Services Article ("C.S."); Code of Maryland Regulations ("COMAR") 12.07.01B(1) (defining ARP). Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance" to include a "complaint of any individual in the custody of the [DOC] against any officials or employees of the [DOC] arising from the circumstances of custody or confinement." COMAR 12.07.01.01(B)(7). To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the IGO against any DOC official or employee. C.S. § 10-206(a).

When the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO. Further, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. *See* C.S. § 10-206(b).

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official," COMAR 12.02.28.02(D)(1), which is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and defined under C.S. § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame.  The prisoner has 30 days to file an appeal to the Commissioner of Correction.  COMAR 12.02.28.14(B)(5).

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO.  COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B).  If the Commissioner fails to respond, the grievant shall file an appeal within 30 days of the date the response was due.  COMAR 12.07.01.05(B)(2).  When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response.  COMAR 12.07.01.04(B)(9)(a).

Exhaustion of administrative remedies for disciplinary proceedings follows a slightly different route.  After receiving a hearing disposition, the inmate must file a written appeal with the "managing official" of the facility, challenging sufficiency of the evidence; interpretation of the law, rules, policy, procedures, or regulations applicable to the disciplinary process; or the sanction imposed.  COMAR 12.03.01.30(A).  If the relief sought is not provided, the prisoner must then file an appeal to the IGO, as set forth in COMAR 12.07.01.05 (governing time limits) and 12.07.01.08 (Standards of Review).  The appeal to the IGO must be filed within 30 days of the date that either the inmate received the warden's final response to the appeal, or the date the warden's response was due.  COMAR 12.07.01.05(C).

If a grievance filed with the IGO is determined to be "wholly lacking in merit on its face," the IGO may dismiss it "without a hearing. . . ."  C.S. § 10-207(b)(1); *see also* COMAR 12.07.01.06(B).  An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  C.S. § 10-207(b)(2)(ii).  However, if a hearing is deemed

necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland

Office of Administrative Hearings. *See* C.S. § 10-208; COMAR 12.07.01.07-.08. The conduct of

such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07(D); *see also* Md.

Code § 10-206(a)(1) of the State Government Article.

A decision of the administrative law judge denying all relief to an inmate is considered a

final agency determination. C.S. § 10-209(b)(1)(ii); COMAR 12.07.01.10(A)(2). However, if the

ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes

a recommendation to the Secretary of DPSCS, who must make a final agency determination within

fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-

209(b)(2),(c); COMAR 12.07.01.10(B).

The statute provides for judicial review. C.S. § 10-210. But, "[a] court may not consider

an individual's grievance that is within the jurisdiction of the [Inmate Grievance] Office or the

Office of Administrative Hearings unless the individual has exhausted the remedies provided" in

Title 10, Subtitle 2 of the Correctional Services Article. C.S. § 10-210(a).

Notably, the Fourth Circuit recently determined that, under Maryland law, the

administrative remedy process is unavailable where the event complained of is the subject of an

Intelligence and Investigative Division ("IID") investigation. *Younger v. Crowder*, 2023 WL

5438173 at *5. If an inmate files a grievance concerning a matter under investigation by IID, it

will "automatically be dismissed as procedurally deficient" under COMAR 12.02.28.11(B). *Id.*

Although the inmate could, "[i]n theory . . . appeal this automatic dismissal to the Commissioner

of Corrections," the Fourth Circuit ruled that such an appeal would be "futile because the

regulations demand the dismissal of such an appeal." *Younger*, 2023 WL 5438173, at * 5.

Moreover, "an intrepid inmate who appeals his loss before the Commissioner of Corrections to the

Inmate Grievance Office while an investigation is pending would suffer the same fate." *Id.*; *see* C.S. § 10-207 (authorizing the IGO to summarily dismiss a grievance that is "wholly lacking in merit on its face"); COMAR § 12.07.01.08(C) (requiring an inmate to show the IGO that the underlying dismissal is "arbitrary and capricious" or "contrary to law")." And, "[a]n administrative remedy is unavailable if an inmate's only hope for relief is that officials act contrary to statute and regulation." *Younger*, 2023 WL 5438173, at *5.

But, the concerns at issue in *Younger* are not present here. This case does not concern an IID investigation. In fact, Mills alleges that he filed an ARP to Warden Bishop but did not receive a response. He claims that he then filed an appeal to the Commissioner.

It is undisputed that the Commissioner received correspondence from Mills, but it is also clear that Mills was advised that what he submitted to the Commissioner was not sufficient. Instead of resubmitting the ARP appeal to the Commissioner as directed, or even beginning anew the ARP process by filing an initial ARP at the institutional level, Mills instead filed documents with the IGO.

Taking Mills's allegations as true that he properly instituted an ARP at the institutional level and the Warden failed to respond, there is no dispute on the record before the court that his appeal to the Commissioner was improper because it did not have the required paperwork. And, after Mills was advised of the deficiency, he took no steps to cure same.

Accordingly, Mills failed to exhaust his administrative remedies as to the Correctional Defendants. Therefore, his claims against them must be dismissed.

Nevertheless, even assuming that Mills exhausted his administrative remedies, his claims fail, for the reasons discussed below.

B.  ADA and Rehabilitation Act

Mills alleges that Defendant Clark's conduct toward him violated the Americans with Disabilities Act and the Rehabilitation Act, which are generally construed to impose the same requirements due to the similarity of their language.  *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999).

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2).  The ADA contains five titles:  Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions.

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; *see Richardson v. Clarke*, 52 F.4th 614, 619 (4th Cir. 2022).  It prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," 42 U.S.C. § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability."  *Id.* § 12132.

Title II of the ADA applies to "'anything a public entity does.'"  *Seremeth v. Bd. of County Comm'rs of Frederick County*, 673 F.3d 333, 338 (4th Cir. 2012) (citing cases) (citations omitted); *see also Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 380-81 (D. Md. 2011). Of import here,

Title II applies to state prisons.  *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("State prisons fall squarely within the statutory definition of 'public entity . . .'").

For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  And, it is well established that a private party may sue to enforce Title II of the ADA.  *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir. 1994); *Davis v. Southeastern Community Coll.*, 574 F.2d 1158, 1159 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979).

To state a claim under Title II of the ADA, a plaintiff must allege that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of the disability.  *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016); *see also Richardson*, 52 F.4th at 619; *Helping Hand, LLC v. Baltimore County*, MD, 515 F.3d 356, 362 (4th Cir. 2008); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

"Discrimination" barred by Title II includes "a failure to make reasonable modifications" that are "necessary" to provide a disabled individual with "full and equal enjoyment" of the facility's services.  *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012). The term "reasonable accommodations," which is derived from the employment discrimination provisions of Title I of the ADA, is essentially synonymous with the term "reasonable

modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services," 42 U.S.C. § 12131(2), which is what Title II of the ADA requires a public entity to provide. *See, e.g.*, *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

A reasonable modification does not require the public entity to employ any and all means to make services available to persons with disabilities. *Richardson*, 52 F.4th at 619; *Constantine*, 411 F.3d at 488-89. Rather, the public entity is obligated to make those modifications that do not "fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Bircoll v. Miami-Dade*, 480 F.3d 1072, 1082 (11th Cir. 2007); *see also Lamone*, 813 F.3d at 507-08 ("A modification is reasonable if it is 'reasonable on its face' or used 'ordinarily or in the run of cases' and will not cause 'undue hardship.'" (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012)); *Pashby v. Delia*, 709 F.3d 307, 323 (4th Cir. 2013).

The Rehabilitation Act, 29 U.S.C. § 794, was enacted seventeen years prior to the ADA. It provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

Section 504 of the Rehabilitation Act is closely related to Title II of the ADA and, to "the extent possible, [courts] construe similar provisions in the two statutes consistently." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002); *see Seremeth*, 673 F.3d at 336 n.1 ("Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same.'") (citation omitted); *Rogers v. Dept. of Health & Environmental Control*, 174 F.3d 431, 433-34 (4th Cir. 1999) (stating that courts may apply Rehabilitation Act precedent in interpreting the ADA, and vice versa). Indeed, the statutes "share the same definitions of disability," *id.* at 433, and Title II of the ADA explicitly provides that "[t]he remedies, procedures, and rights" provided under § 504 of the Rehabilitation Act "shall be the remedies, procedures, and rights [that Title II of the ADA] provides to any person alleging discrimination on the basis of disability. . . ." 42 U.S.C. § 12133.

In turn, the Rehabilitation Act incorporates by reference the "remedies, procedures, and rights" established by Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000d *et seq.*, which prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance. 29 U.S.C. § 794a(a)(2). Accordingly, courts look to Title VI precedent to resolve remedial and procedural issues arising in Rehabilitation Act and ADA Title II cases.

In general, a successful plaintiff in a suit under Title II of the ADA or § 504 of the Rehabilitation Act is entitled to a "full panoply" of legal and equitable remedies, including money damages and injunctive relief. *Pandazides*, 13 F.3d at 830; *see generally id.* at 829-32. However, there are some limitations as to available relief. Punitive damages are not available. *See Barnes*, 536 U.S. at 189. Moreover, compensatory damages are available only upon proof of disparate treatment, rather than mere disparate impact. *Pandazides*, 13 F.3d at 829-30 & n.9

Despite the general congruence of Title II of the ADA and § 504 of the Rehabilitation Act, they differ as to the causation standard. *Richardson*, 52 F.4th at 617 n.1; *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012). A plaintiff must show a different "causative link between discrimination and adverse action" under the two statutes. *Baird*, 192 F.3d at 469.

Under Title II of the ADA, a plaintiff need only prove discrimination "by reason of" disability. 42 U.S.C. § 12132. But, a successful Rehabilitation Act claimant must show denial of benefits or discrimination "*solely* by reason of" disability. 29 U.S.C. § 794(a) (emphasis added); *see Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018); *see also Constantine*, 411 F.3d at 498 n.17 ("[W]e have recognized that the causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are 'significantly dissimilar.'") (quoting *Baird*, 192 F.3d at 469). In other words, § 504 imposes "a stricter causation requirement than the ADA." *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 641 (4th Cir. 2016).

A second significant difference between Title II and the Rehabilitation Act is that, as noted, Title II applies to any "public entity." 42 U.S.C. § 12132. But, § 504 of the Rehabilitation Act applies only to federal agencies or to "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Thus, to show a violation of the Rehabilitation Act by a state, local, or private entity, a plaintiff must demonstrate that the "program or activity" at issue receives "Federal financial assistance." *Id.*

The ADA defines "public entity" as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(A)-(B). "By its plain language, this definition does not include private individuals or private entities." *Wright v. Carroll Cty. Bd. of Educ.*, ELH-11-3103, 2013 WL 4525309, at *19 (D. Md. Aug. 16, 2013) (internal quotation marks and citations omitted);

*see Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010) (per curiam) ("[T]he ADA . . . do[es] not provide for causes of action against defendants in their individual capacities.").

To be clear, the statutes do not apply against individuals. Therefore, Mills's claims under these statutes cannot proceed against Clark. *Baird*, 192 F.3d at 471 (upholding the dismissal of ADA claims against individuals because Title II recognizes a cause of action only against public entities, not private individuals); *see also Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (joining the Fifth, Eighth, and Eleventh Circuits in holding that "a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA or section 504 of the Rehabilitation Act"); *Dorsey v. Hogan*, TDC-21-0721, 2022 WL 4467247, at *6-7 (D. Md. Sept. 26, 2022) (holding that Rehabilitation Act does not apply to Corizon, a private contractor, or its individual employees); *Jennings v. Frostburg State Univ.*, ELH-21-656, 2021 WL 5989211, at *10 (D. Md. Dec.16, 2021) (dismissing individual defendants sued under the Rehabilitation Act after determining that there is no basis for individual liability). Thus, Mills's claims against Clark under the ADA and the Rehabilitation Act must be dismissed.

In any event, even if the various defendants were proper parties, the claims would fail. The parties agree that Mills suffers from mental illness. But, he has failed to explain how his rights were violated by the Correctional Defendants or the Medical Defendants. Mills, in the custody of the State, is not entitled to take any action he desires under the guise of his mental health issues or use the ADA or the Rehabilitation Act as a vehicle to bar the correctional and medical staff from responding to his dangerous conduct.

In sum, Mills offers no facts to support his conclusory allegation that he was discriminated against under the ADA or the Rehabilitation Act. Therefore, the claims are subject to dismissal for failure to state a claim.

### C.  Claims as to Religious Beliefs

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  However, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs, without concern for the possibility of punishment.  *See Cruz v. Beto*, 405 U.S. 319, 322 (1972); *see Heyer v. United States Bureau of Prisons*, 984 F.3d 347, 355 (4th Cir. 2021) (recognizing that prisoners enjoy certain constitutional rights).

As a threshold matter, to state a claim for violation of rights under the Free Exercise Clause of the First Amendment, plaintiff must allege that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion.  *See Wilcox v. Brosn*, 877 F. 3d 161, 168 (4th Cir. 2017) (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)); *see Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018).  A substantial burden is placed upon a prisoner's religious exercise when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 718.

Nevertheless, prison restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the constitution.  *See Turner v. Safely*, 482 U.S. 78, 89-91 (1987).  Prison officials have the duty to safeguard the health and safety of inmates committed to their custody.  *McRae v. Johnson*, 261 F. App'x 554, 558 (4th Cir. 2008); *see Pegram v. Williamson*, 18-cv-838, 2020 WL 564136, at *6 (M.D.N.C. Feb. 5, 2020).

Mills's religious practices are provided even greater protection under RLUIPA.  Therefore, if a plaintiff is unable to sustain his RLUIPA claim, there is no need for the court to consider separately the claim under the First Amendment, as the claim will necessarily fail there too.  *See, e.g., Tillman*, 187 F. Supp. 3d at 675; *Lovelace*, 472 F.3d at 198.

In relevant part, RLUIPA states, 42 U.S.C. § 2000cc-1(a):

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005); *see Holt v. Hobbs*, 574  U.S. 352, 357-58 (2015); *Smith v. Ozmint,* 578 F.3d 246, 250 (4th Cir. 2009); *Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir. 2006).  Enactment of RLUIPA restored religious free exercise rights to prisoners, similar to those enjoyed by those who are not incarcerated.  *See Cutter*, 544 U.S. at 715-17.

A plaintiff seeking relief under RLUIPA has the initial burden to show that the challenged policy "implicates his religious exercise."  *Holt*, 574 U.S. at 360; *see Richardson*, 52 F.4th at 622. RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A); *Holt,* 574 U.S. at 358; *Smith.* 578 F.3d at 251.

Under RLUIPA, an inmate initially must show that the challenged policy substantially burdens the exercise of his "sincerely held religious beliefs." *Wright v. Lassiter*, 921 F.3d 413, 418 (4th Cir. 2019); *see Carter*, 879 F.3d at 139-40; 42 U.S.C. § 2000cc–2(b). A prison regulation imposes a substantial burden on religious belief when it places "substantial pressure on an adherent to modify his behavior and to violate his beliefs" or "forces a person to choose between following the precepts of [his] religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand." *Lovelace*, 472 F.3d at 187; *see Richardson*, 52 F.4th at 622.  If a plaintiff makes the requisite showing, "the court proceeds to the second stage to determine whether the prison's policies are justified despite the imposed burden." *Richardson*, 52 F.4th at 622.  And, "the policies must represent the least restrictive means of furthering a compelling governmental interest." *Id.*; *see Holt*, 574 U.S. at 357-58; 42 U.S.C. § 2000cc-1(a).

Mills need not prove that the practice at issue is "required or essential" to his religion, but he must at least "demonstrate that the government's denial of a particular religious. . . observance was more than an inconvenience to [his] religious practice." *Tillman*, 187 F. Supp.3d at 673 (citations omitted).  "'[C]ourts properly consider whether the inmate retains other means for engaging in the particular religious activity . . . in assessing whether a denial of the inmate's preferred method for engaging in that religious exercise imposes a substantial burden.'" *Id.* (quoting *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013)).

As indicated, RLUIPA "prescribes a shifting burden of proof for inmate religious exercise claims." *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015).  A prisoner must initially "demonstrate that the prison's policy exacts a substantial burden on religious exercise," and then

54

the burden "shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means." *Id.* Notably, prison security is a compelling interest. *Cutter*, 544 U.S. at 725, n. 13. Courts "are ill equipped to deal with the increasingly urgent problems of prison administration and reform" and must exercise restraint in cases dealing with the administration of prisons. *Procunier v. Martinez*, 416 U.S. 396, 405 (1974).

Deference is afforded to prison administrators who must regulate the prison while balancing the prisoners' rights to free exercise of religion with the maintenance of the security of the institution. *Cutter*, 544 U.S. at 723. Moreover, in enacting RLUIPA, Congress "anticipated that courts would apply [RLUIPA's] standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline consistent with considerations of costs and limited resources." *Cutter* 544 U.S. at 723 (citing legislative history).

There is certainly evidence in the record that would readily support a finding that Mills was engaged in a hunger strike in an effort to secure single-cell housing. However, I must construe all of the facts in Mills's favor. Therefore, I shall assume that his fast was a religious act. Even so, Mills has failed to demonstrate that a substantial burden was placed on his religious practice.

There is no allegation, much less demonstrable fact, that Clark or any other correctional or medical staff prevented Mills from fasting. The evidence clearly demonstrates that Mills was able to engage in his Christian fast and that protocols were put in place to insure he did so safely and that he was educated about the ongoing and increasing risks of fasting. These efforts, such that they were, did not create a substantial burden on Mills's religious practice, in violation of RLUIPA. To the contrary, Mills explains that he stopped his fast when he "hears God's call to end it" ECF

1-2 at 23. He does not offer any explanation of his religious beliefs or the need for fasting other than to say it is beneficial and desirable.

Given the threat to Mills's health and safety due to his prolonged fast, the Correctional Defendants and the Medical Defendants had compelling reasons to monitor Mills frequently, move him to the infirmary to better monitor his health, and to educate him on the risks associated with prolonged fasting.  This occurred under medical guidance and in accordance with DPSCS policies, which apply to all inmates who refuse to eat, whether they are engaged in a hunger strike, religious fast, or they refuse to eat for any other reason.  The policy does not distinguish or discriminate against  an inmate based on religious beliefs.

Mills must allege facts that, if proven, would establish that defendants intentionally interfered with his religious practices. Had Mills properly exhausted this claim as to any of the Correctional Defendants, his claim would fail as to them, as well. There is simply no evidence before the court to suggest that any of the Correctional Defendants or Medical Defendants interfered with Mills's religious practices.  To the extent that Mills's religious exercise was actually interfered with by staff counselling him on the detrimental effects of prolonged fasting, such conduct is not remediable under either the First Amendment or RLUIPA.  *Lovelace*, 472 F.3d at 194; *Meyer v. Teslki*, 411 F. Supp. 2d 983, 991 (W.D. Wis. 2006) (holding a prison official violates an inmate's rights under RLUIPA if he intentionally and without sufficient justification denies an inmate his religiously mandated diet.)

As to Mills's complaint that officers spoke to him during his fast in a hostile way, even if he had properly presented and exhausted this claim through the administrative process, it would be subject to dismissal as Mills has again failed to allege how the conduct created a substantial

burden to his religious observance.  Mills provides no specifics regarding the allegations of threats, hostility, and harassment as to his religious fast.

Even if encouraging Mills to end his fast somehow constituted interference with his religion, such encouragement was reasonably related to legitimate penological interests because, in the prison setting, maintaining the health and safety of inmates constitutes a compelling government interest.  *McRae*, 261 F. App'x at 558.  The defendants had both the right and the duty to take reasonable steps to ensure Mills's physical and mental health as he engaged in his fast.  *See Pegram*, 18-cv-838, 2020 WL 564136 at *6 (4th Cir.  Feb. 5, 2020) (citations omitted); *Williams v. Fleming*, 2007 WL 2693644 at * 3 (W.D. Va. Sept. 13, 2007).

In any event, RLUIPA does not support a claim for monetary damages against state officials, such as the Correctional Defendants.  *Sossaman v. Texas*, 563 U.S. 277, 293 (2011) (holding that acceptance of federal funds by States does not amount to consent to waiver of sovereign immunity to RLUIPA claims for monetary damages against state employees in their official capacities);  *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (holding RLUIPA does not authorize a claim for money damages against a state employee sued in their individual capacity). As such, Mills's only potential remedies under RLUIPA are equitable.

## D.  Retaliation

Mills also claims that he was retaliated against for exercising his religious rights. Notably, "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," but "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228-29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with

the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

To state a claim of retaliation for exercising a First Amendment right, a plaintiff must allege that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *cf. Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (outlining elements of a Title VII retaliation claim) .

A plaintiff can establish retaliatory conduct if the defendant took an action against the plaintiff that "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quotation marks and citation omitted). A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity, and that the retaliatory act was temporally proximate to that activity. *Id.*

In the prison context, courts "treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). As such, an inmate cannot simply assert a generalized retaliatory animus but must allege facts that support the claim of retaliation. *White v. White*, 886 F. 2d 721, 724 (4th Cir. 1989). Moreover, a retaliation claim fails if there is a legitimate reason for

the alleged retaliatory action. *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Had Mills properly exhausted his claim of retaliation, he would not be entitled to relief as to the Correctional Defendants. Mills does not dispute that the information written in each NOIRV was accurate: he refused to be handcuffed in order to effectuate his move to another cell. Nor does Mills dispute that he advised staff that his Christian fast was undertaken in an effort to secure single cell housing. Further, the record demonstrates that the Correctional Defendants and the Medical Defendants counseled Mills regarding his Christian fast and the ill effects on his health due to the fasting. Ultimately, the fast was ended by Mills when he was offered a year of a single cell, and when Mills heard the word of God, advising him to stop the fasting. There is no indication that any of the named defendants forced Mills to end his fast or retaliated against him in any way for practicing his faith. The staff interacted with Mills to manage the needs of the institution relative to Mills's cell assignment and also to protect Mills's safety, in furtherance of penological objectives.

Mills's assertions that the NOIRVs and his treatment during his fast were improperly premised on his religious practice amounts to an impermissible effort to bolster a frivolous complaint by adding allegations of retaliation. *See Brown v. Carpenter*, 889 F. Supp. 1028, 1034 (W.D. Tenn. 1995) ("A plaintiff cannot bootstrap a frivolous complaint with conclusory allegations of retaliation.").

Clark is also entitled to summary judgment as to Mills's retaliation claim. There is simply no evidence that Clark lied to Mills about his kidneys failing, as he claims. Rather, the evidence shows that Clark sought to educate Mills on the dangers of his fast, which he acknowledged. Additionally, Mills's laboratory work showed that his fast had, in fact, resulted in deleterious

effects on his health.  Clark followed DPSCS policy in supporting Mills during his fast and there is simply no evidence that she retaliated against him in any way for engaging in a religious fast. Instead, the medical monitoring and precautions ensured that Mills could safely engage in a religious fast.  Clark is entitled to summary judgment.

### E.  Individual Liability

As discussed, § 1983 requires a showing of personal fault based upon a defendant's personal conduct.  *See*, *e.g.*, *Iqbal*, 556 U.S. at 677; *Younger*, 2023 WL 5438173, at *5 n.12; *Vinnedge*, 550 F.2d at 928.  In the suit, Mills does not attribute any specific action or inaction to defendants Hogan, Green, Hill, Bishop, Schmitt, Taylor, Woolford, or YesCare Corp. that resulted in a constitutional violation.  Mills alleges that Hogan, Green, Hill, Bishop, Schmitt, Taylor, and Woolford ignored his complaints when they processed his grievances.  *See* ECF 1-2 at 26-28, 47-48.  But, a denial of a grievance does not alone give rise to liability.  *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation) (citing *Whitington v. Ortiz*, 307 Fed. App'x 179, 193 (10th Cir. 2009) (unpublished) ("denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations.")  And, Mills provides no specific allegations as to YesCare Corp.  Thus, Mills fails to state a claim against these defendants.  *See Langford v. Joyner*, 62 F.4th 122, 125-26 (4th Cir. 2023).

Moreover, to the extent Mills intends to sue Hogan, Green, Hill, Bishop, Schmitt, Taylor, Woolford, and YesCare Corp. in their capacity as supervisors, he cannot succeed.  As discussed, the doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane*, 355 F.3d at 782 (holding that there is no respondeat superior liability under § 1983).  Further, a private corporation such as YesCare is not liable under § 1983 for actions allegedly committed by its

employees when such liability is predicated solely upon a theory of respondeat superior.  *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009).

Liability of supervisory officials may be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).  "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability."  *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Mills has failed to plead facts that, if proven, amount to supervisory indifference to or tacit authorization of misconduct by employees at NBCI.  And, his assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability.  Therefore, on this ground, the suit is subject to dismissal as to Hogan, Green, Hill, Bishop, Schmitt, Taylor, Woolford, and YesCare Corp.

### F.  Injunctive Relief

Mills seeks injunctive relief.  A party seeking a preliminary injunction or temporary restraining order must establish the following elements:  (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Failure to establish one of these elements is fatal to the request for injunctive relief.

For the reasons discussed above, Mills  has failed to demonstrate the likelihood of success on the merits.  Therefore, his request for injunctive relief must be denied.

## IV. Conclusion

For the foregoing reasons, I shall dismiss the Complaint as to the Correctional Defendants for failure to exhaust administrative remedies.   However, even assuming that Mills properly exhausted his claims, his claims under the ADA and the Rehabilitation Act are subject to dismissal for failure to state a claim, and defendants are entitled to summary judgment with respect to the remaining claims.

The motion of defendants YesCare and Clark, construed as a motion for summary judgment, shall be granted.[7]

A separate Order follows.


September 5, 2023                                    _____/s/_____
Date                                                Ellen L. Hollander
                                                    United States District Judge

_____

[7] Having found no constitutional violation, the court need not address the Correctional Defendants' defense of qualified immunity. Nor will the court address defendants' additional defenses.